United States District Court
For the Northern District of California

1
2
3
4
5       UNITED STATES DISTRICT COURT
6       NORTHERN DISTRICT OF CALIFORNIA
7

| | |
|---|---|
| JAMES HILLIARD,  Plaintiff,  v.  JO ANNE B. BARNHART, Commissioner of Social Security,  Defendant. | No. C-05-2658 EMC  **ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT, DENYING DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT, AND REMANDING (Docket Nos. 13, 14)** |

_____/

On December 12, 2002, Plaintiff James Hilliard filed an application for disability insurance benefits under Title II of the Social Security Act ("Act") and supplemental security income benefits under Title XVI of the Act. The application was denied on March 28, 2003, after which Mr. Hilliard requested a hearing before an administrative law judge ("ALJ"). Administrative Record ("A.R.") at 44-47. A hearing was held before an ALJ on October 5, 2004. Subsequently, on December 14, 2004, the ALJ issued his decision, concluding that Mr. Hilliard was able to perform his past relevant work and was therefore not "disabled" under the Act.

Mr. Hilliard has exhausted his administrative remedies with respect to his claim of disability. This Court has jurisdiction for judicial review pursuant to 42 U.S.C. § 405(g). Mr. Hilliard has moved for summary judgment, seeking a reversal of the Commissioner's decision and a remand for a rehearing and complete development of the record. The Commissioner has cross-moved for summary judgment. Having considered the parties' briefs and accompanying submissions, including but not limited to the administrative record, and good cause appearing therefor, the Court hereby **GRANTS** Plaintiff's Motion for Summary Judgment, **DENIES** the Commissioner's Cross-

Motion for Summary Judgment, and **REMANDS** the case for further proceedings consistent with this order.

## I. FACTUAL & PROCEDURAL BACKGROUND

On August 23, 2001, Mr. Hilliard filed an application for disability insurance benefits and supplemental security income benefits. A.R. at 13. Mr. Hilliard's initial claim was based on "slowness in work situation[s]" due to a brain operation in 1968, which allegedly limited Mr. Hilliard's "ability to perform at a satisfactory pace for employers." A.R. at 79. The Social Security Administration ("SSA") staff reviewing his application recommended psychological testing based his alleged disability. A.R. at 105. Mr. Hilliard was examined by Dr. George Norbeck, who also recommended psychological testing based on the possibility of a cognitive disorder. A.R. at 105. As a result, a consultative psychological examination was conducted by Dr. Ranald Bruce on January 9, 2002. A.R. at 187. Mr. Hilliard's initial application for benefits was denied on January 22, 2002, and he chose not to appeal that decision. A.R. at 13.

On December 12, 2002, Mr. Hilliard filed a second round of claims for social security benefits, this time based on his frequent seizures, a recent broken hand, and general aches and stiffness. The second application was denied on March 28, 2003. *Id.* On August 13, 2003, Tony Arjo was appointed as counsel for Mr. Hilliard, who then filed a request for a hearing before an ALJ. A.R. at 44-47.

A hearing was held before an ALJ on October 5, 2004. At the hearing, the ALJ indicated that he would consider disabilities alleged in *both* of Mr. Hilliard's applications. A.R. at 336. On December 14, 2004, the ALJ issued his decision, concluding that Mr. Hilliard was able to perform his past relevant work and was therefore not "disabled" under the Act. A.R. at 14. In reaching this decision, the ALJ undertook the five-step sequential evaluation process for disability required under 20 C.F.R. §§ 404.1520 and 416.920.

> Step one disqualifies claimants who are engaged in substantial gainful activity from being considered disabled under the regulations. Step two disqualifies those claimants who do not have one or more severe impairments that significantly limit their physical or mental ability to conduct basic work activities. Step three automatically labels as disabled those claimants whose impairment or impairments meet the duration requirement and are listed or equal to those listed in a given

2

> appendix. Benefits are awarded at step three if claimants are disabled. Step four disqualifies those remaining claimants whose impairments do not prevent them from doing past relevant work. Step five disqualifies those claimants whose impairments do not prevent them from doing other work, but at this last step the burden of proof shifts from the claimant to the government. Claimants not disqualified by step five are eligible for benefits.

*Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003).

The ALJ found that there was insufficient evidence to deny Mr. Hilliard's claim at step one based on the performance of substantial gainful activity. A.R. at 15. At step two, the ALJ determined that Mr. Hilliard's physical ailments were "severe" under the Act. However, the ALJ found that there was "no evidence that the claimant suffers from any deficits in his cognitive functioning." A.R. at 15. Mr. Hilliard's impairments did not meet the criteria for any of the listed impairments under step three. Next, the ALJ determined that based on Mr. Hilliard's mixed seizure disorder and chronic right shoulder impingement, his residual functional capacity ("RFC") showed that he was able to perform light work. A.R. at 16-18. At step four, the ALJ found that Mr. Hilliard's RFC qualified him to do "his prior work as a file clerk, record clerk, collector, and desk clerk, the sedentary and light clerical jobs he has held over the relevant period of time in issue." A.R. at 19. The ALJ, therefore, found that Mr. Hilliard was not qualified for benefits under the Act. A.R. at 19.

## II. DISCUSSION

### A. Legal Standard

The district court may disturb the final decision of the SSA "only if it is based on legal error or if the fact findings are not supported by substantial evidence." *Sprague v. Bowen*, 812 F.2d 1226, 1229 (9th Cir. 1987). "Substantial evidence, considering the entire record, is relevant evidence which a reasonable person might accept as adequate to support a conclusion." *Matthews v. Shalala*, 10 F.3d 678, 679 (9th Cir. 1993). Substantial evidence means "more than a mere scintilla, but less than a preponderance." *Young v. Sullivan*, 911 F.2d 180, 183 (9th Cir. 1990) (internal quotation marks omitted). The court's review must "consider the record as a whole," both that which supports as well as that which detracts from the Secretary's conclusion. *Desrosiers v. Secretary of Health & Hum. Servs.*, 846 F.2d 573, 576 (9th Cir. 1988). "If the evidence admits of more than one rational

interpretation, [the court] must uphold the decision of the ALJ." *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984).

That being said, "[t]he ALJ in a social security case has an independent 'duty to fully and fairly develop the record and to assure that the claimant's interests are considered.'" *Tonapetyan v. Halter*, 242 F.3d 1144, 1151 (9th Cir. 2001) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1288 (9th Cir. 1996)). The Ninth Circuit has recently reiterated that "the ALJ should not be 'mere umpire' during disability proceedings," but must "'scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.'" *Widmark v. Barnhart*, ___ F.3d ___, 2006 DJDAR 9741, 9443 (9th Cir. 7/26/06). "Ambiguous evidence, or the ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'" *Id.* (citing *Smolen*, 80 F.3d at 1288). "This duty extends to the represented as well as to the unrepresented claimant." *Tonapetyan* at 511. "The ALJ's duty to develop the record fully is also heightened where the claimant may be mentally ill and thus unable to protect [his] own interests." *Id.* (citing *Higbee v. Sullivan*, 975 F.2d 558, 562 (9th Cir. 1992)); *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1990) ("In cases of mental impairments, this duty [to develop the record] is especially important.").

The Commissioner argues that the claimant "carries the initial burden of proving a disability" and thus Mr. Hilliard's failure to provide objective medical evidence of his psychological impairment precludes a finding that the record was inadequately developed. However, the Commissioner confuses the burden of *proof*, which is clearly on the claimant at step two, with the ALJ's independent duty to develop the record, which is triggered by ambiguous evidence. *Tonapetyan*, 242 F.3d at 1151; *see Jones v. Bowen*, 829 F.2d 524, 526 (5th Cir. 1987) (claimant need only "raise a suspicion" about his impairment in order to trigger the ALJ's duty to develop the record). As discussed below, Mr. Hilliard raised a suspicion concerning his alleged cognitive impairment thus triggering the need for development of an adequate record.

"One of the means available to an ALJ to supplement an inadequate medical record is to order a consultative examination, *i.e.*, 'a physical or mental examination or test purchased for [a claimant] at [the Social Security Administration's] request and expense.'" *Reed v. Massanari*, 270

4

F.3d 838, 841 (9th Cir. 2001) (citing 20 C.F.R. §§ 404.1519, 416.919).  Although "[t]he government is not required to bear the expense of an examination for every claimant," consultative examinations are normally required when additional evidence is needed or when there is an "ambiguity or insufficiency in the evidence [that] must be resolved."  *Id.* at 842 (citing 20 C.F.R. §§ 404.1517-19).

B.     Dr. Bruce's Report

As noted above, Mr. Hilliard filed two different applications for social security benefits, one on August 23, 2001 and the second on December 12, 2002.  In his first application, he claimed a mental disability, and an examining physician recommended that a psychological evaluation be prepared.  A.R. at 105; *see also* A.R. at 92 (noting that psychiatric development is needed in the form of a psychological consultative examination).  Although Mr. Hilliard's first application for benefits was denied, the ALJ who considered his second application for benefits stated that he would consider disabilities alleged in *both* of Mr. Hilliard's applications.  Thus, the ALJ considered the issue of whether Mr. Hilliard was disabled because of a mental impairment.

In his motion for summary judgment, Mr. Hilliard argues that the ALJ failed to fully and fairly develop the record with respect to psychological evidence.  The only psychological evidence in this case is a report based on the examination by Dr. Bruce.  Mr. Hilliard was not represented by counsel at the time of the examination.  According to Mr. Hilliard, Dr. Bruce's report was insufficient because it ignored evidence of diminished cognitive functioning and memory problems "based on vague accusations of inadequate effort and multiple inconsistencies."  A.R. at 168-69.  Because Mr. Hilliard believed that Dr. Bruce's report was inadequate, he requested additional psychological testing; however, the ALJ never ruled on the request.  *See* A.R. at 13-20.  Instead, the ALJ determined that, given Mr. Hilliard's college education and lack of any head injury, "it would be most difficult to believe his cognitive functioning is deficient."  A.R. at 15.

An ALJ's duty to develop the record is triggered either by ambiguous evidence or by the "ALJ's own finding that the record is inadequate to allow for proper evaluation of the evidence."  *Tonapetyan*, 242 F.3d at 1150 (citing *Smolen*, 80 F.3d at 1288).  In *Tonapetyan*, although the ALJ "did not specifically find that the evidence of Tonapetyan's mental impairment was ambiguous, or that he lacked sufficient evidence to render a decision, he relied heavily upon the testimony of the

medical expert, Dr. Walter, who found just that." 242 F.3d at 1150.  The medical expert found the claimant's psychological record "confusing" and recommended that a more detailed report be obtained.  *Id.*  Dr. Walter "found it 'difficult to say' whether the medical record was complete enough to allow the ALJ to reach a conclusion" and "remained equivocal throughout his testimony." *Id.*  The court held that, because the ALJ relied on the expert's testimony, he "was not free to ignore Dr. Walter's equivocations and his concerns over the lack of a complete record" and that the ALJ's failure to obtain a more detailed report constituted reversible error.  *Id.* at 1150-51.

The instant case is analogous to *Tonapetyan*.  Although recognizing that "Dr. Bruce said his testing of the claimant was compromised by the claimant's lack of effort" and although noting that he has "often disagreed with Dr. Bruce," the ALJ nevertheless relied on Dr. Bruce's report in finding that he "did not diagnose a personality disorder and there is nothing else in the record to suggest that the claimant has one."  A.R. at 15.  It appears that the ALJ relied on Dr. Bruce's conclusion that Mr. Hilliard did not have any intellectual or memory limitations.  A.R. at 15.  This reliance, however, was not warranted because -- as even Dr. Bruce himself recognized -- he did not have sufficient information to make a diagnosis.  More specifically, Dr. Bruce's "diagnostic impression" under the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV") notes a "799.9 Diagnosis Deferred" for Axis II.  A.R. at 188.  Under the DSM-IV framework, Axis II includes personality disorders and mental retardation. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders*, 25-27 (4th ed., American Psychiatric Association 1994).[1]  A diagnosis of 799.9 is employed to indicate uncertainty when the "[i]nformation [is] inadequate to make any diagnostic judgement about an Axis II diagnosis," as opposed to 71.09, which is used when "no diagnosis" is made.  American Psychiatric Association at 4, 687.

Although Dr. Bruce later concluded that Mr. Hilliard "has no psychological limitations and restrictions in the areas of common daily activities or in interpersonal and social relationships," this

---

[1] The other DSM-IV Axes cover clinical disorders (I), general medical conditions (III), psychosocial and environmental problems (IV), and global assessments (V).  Dr. Bruce diagnosed Mr. Hilliard as "305.00 Alcohol Abuse, in claimed remission" on Axis I.  A.R. at 188.

6

finding is not supported by his concurrent finding that the psychological evidence was inadequate to make any diagnosis under Axis II. A.R. at 188-89. Dr. Bruce's diagnosis was thus incomplete.

It is important to note that Mr. Hilliard's consultative psychological examination with Dr. Bruce was requested by both the SSA staff reviewing his application and by Dr. George Norbeck. A.R. at 104-05. Once the claimant has been recommended for a consultative examination, inconclusive examination results are not sufficient to meet the ALJ's duty to develop the record.

Next, the Commissioner argues that Mr. Hilliard's "failure to cooperate" with Dr. Bruce's examination was inexcusable, and thus another consultative examination was not warranted. The Court does have concerns about the level of Mr. Hilliard's cooperation during his consultative examination. As the ALJ noted, this behavior may have been an attempt to "manipulate the test results in his favor." A.R. at 15. Equally troubling, however, is the apparent fact that only Dr. Bruce noted any difficulties when treating Mr. Hilliard. Dr. Bruce described Mr. Hilliard as "an average height and weight, entitled, complaining, frowning, griping, uncooperative, obstructionist man who railed on about 'the system' and its failure to meet his needs." A.R. at 187. Additionally, he noted that "Ms. [sic] Hilliard gave an inadequate effort on testing. There were multiple inconsistencies noted between his performance and other observations and information." A.R. at 188. In contrast to Dr. Bruce's description, other medical professionals who interviewed Mr. Hilliard found him to be "pleasant and informative," and noted that he communicated clearly and responded to all questions appropriately and in a concise manner. A.R. at 93, 119. Indeed, the ALJ noted that Mr. Hilliard had no problem understanding or responding to questions at the hearing. A.R. at 15. Given the ALJ's duty to develop the record, the ALJ should have ordered an additional test under these circumstances.

Indeed, even if it were assumed that Mr. Hilliard was unwilling to cooperate during his consultative psychological examination with Dr. Bruce, several courts have held that when faced with an uncooperative claimant, the ALJ's duty to develop the record still obtains. In *Barnave v. Barnhart*, the claimant "refused to cooperate with consultative psychiatric appointment attempts." 2005 U.S. Dist. LEXIS 9039, *22 (E.D.N.Y May 13, 2005). Nonetheless, the court found that:

7

> The ALJ's rejection of Barnave's claim for benefits on this ground was based largely on the absence of a complete psychiatric assessment, a deficiency that exists because Barnave adamantly refuses even to visit a consultative examiner who would provide such an assessment. That outcome, while understandable, is inconsistent with the beneficent goals of the program administered by the Commission. Especially where the claimant's uncooperativeness arises in the context of an apparent mental impairment, a greater effort to develop the record is necessary before the ALJ can properly close the door to benefits.

*Id.* at * 25.

In *Williams v. Barnhart*, the claimant's "eligibility for benefits due to her mental retardation depended on a finding that one of her IQ test scores fell below 70. 2003 U.S. Dist. LEXIS 18122, *12 (E.D. Pa. Aug. 29, 2003). The ALJ determined that her most recent scores, which fell far below 70, "were invalid because [the claimant] had been uncooperative during testing." *Id.* The court disagreed, holding that "the ALJ had a duty to do more than dismiss the plaintiff's recent scores as invalid on the basis that [the claimant] had been uncooperative. He should have determined why she had been perceived as uncooperative and whether there was a relationship between her mental status and her emotional behavior." *Id.*

Although the Court has not found any Ninth Circuit precedent which has addressed this issue, it finds the reasoning of *Barnave* and *Williams* persuasive. Where, as here, the SSA has determined that a psychological consultative examination is necessary to determine eligibility for benefits, the ALJ should ensure that a proper examination is conducted or investigate the reasons for the claimant's perceived noncooperation.

The ALJ's reliance on Dr. Bruce's report was also problematic because, even though Dr. Bruce concluded that Mr. Hilliard did not have any psychological limitations, the results of the tests administered by Dr. Bruce suggested otherwise. For example, the results of the IQ test placed Mr. Hilliard between mild and moderate mental retardation under the DSM-IV, a fact that should have prompted further investigation from the ALJ. Mr. Hilliard had a full scale score of 55, a verbal score of 61, and a performance score of 57 on the WAIS III IQ test administered by Dr. Bruce. A.R. at 188. Under the section 12.05(B) of the SSA Regulations, "[a] valid verbal, performance, or full scale IQ of 59 or less" qualifies a claimant for mental retardation. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05(B). Dr. Bruce's report did not elaborate or explain the IQ scores, other than to

list the results of the testing. A.R. at 188. Although there are questions about the reliability of Dr. Bruce's testing, *see* page 6, *infra*, an IQ score that places Mr. Hilliard under the category of mentally retarded persons seems to conflict with the conclusion that Mr. Hilliard "should not have problems with concentration, persistence, and/or pace in an average work setting." A.R. at 189. In addition, the report indicated an "estimated memory quotient" of 62 on the Wechsler Memory Scale ("WMS"). Although not discussed in the report, a score of 62 on the WMS would place Mr. Hilliard in the bottom one percentile of test takers, a category described as "extremely low." David Wechsler, *WMS-III Administration and Scoring Manual*, Appendix E, 201 (The Psychological Corporation 1997).

In light of the deferred diagnosis and the results of the tests as described above, Dr. Bruce's report was at best ambiguous evidence as to whether or not Mr. Hilliard had a severe mental impairment, and so the ALJ should have further developed the record. The ALJ's duty to develop the record was especially important given the possibility of mental illness, a point that the Ninth Circuit has repeatedly underscored. *See, e.g.*, *Tonapetyan*, 242 F.3d at 1150. Instead, the ALJ stated that "given the claimant's college education and lack of any head injury, it would be most difficult to believe his cognitive functioning is deficient." A.R. at 15. However, the record does not clearly support this conclusion. First, Mr. Hilliard has consistently stated, in his disability applications and subsequent medical examinations, that he underwent a brain operation to remove a blood clot in either 1968 or 1969. A.R. at 79, 104, 137, 141, 171, 260. Mr. Hilliard's frequent seizures started shortly after the surgery. *Id.* And, while the record does indicate that Mr. Hilliard graduated from college with a degree in sociology, it is entirely possible that he completed his education prior to his brain surgery and the onset of his seizures. A.R. at 337-38.[2] No factual finding was made in this regard. Because of the uncertainty surrounding Mr. Hilliard's mental condition, including the fact that his college education may have been completed before a significant brain trauma occurred, the

---

[2] Mr. Hilliard was born on September 29, 1943. A.R. at 337. He was stationed in Korea while serving in the United States Army from 1962 to 1964. A.R. at 358-59. Unfortunately, the record does not indicate when Mr. Hilliard attended college. It would seem likely, however, that his education took place between 1964, when Mr. Hilliard was around 21 years old, and his brain operation in 1968 or 1969, when he was around 25 years old.

1 ALJ's stated reasons for not finding a cognitive impairment are insufficient. This is another
2 example of why the record should have been further developed.
3 Furthermore, Dr. Bruce's psychological evaluation of Mr. Hilliard seems to contain several
4 inconsistencies and incorrect statements. For example, in his report, Dr. Bruce stated that Mr.
5 Hilliard did not take any medications and specifically did not take any medications for his seizures.
6 A.R. at 187. This statement is in direct conflict with evidence in the record that Mr. Hilliard has
7 been prescribed and is taking medication for his seizure condition. A.R. at 163, 346-349. Mr.
8 Hilliard was prescribed Dilantin shortly after his brain operation and was still taking Dilantin when
9 he met with Dr. McMillian on November 27, 2001. A.R. at 171. When Mr. Hilliard filled out a
10 seizure questionnaire on February 13, 2002, one month after his visit with Dr. Bruce, he indicated
11 that he had been taking Dilantin since 1970. A.R. at 132-34.
12 Dr. Bruce's report which contains inaccuracies, inconsistencies and acknowledge
13 incompleteness and omits a diagnosis of Mr. Hilliard's mental health leaves such ambiguity as to
14 require further development of the record, as he was authorized to do under 20 C.F.R. § 404.1512(e).
15 *See Widmark*, *supra*, 2006 DJDAR at 9743.

### III. CONCLUSION

17 Based on the above, the Court hereby GRANTS Plaintiff's Motion for Summary Judgement
18 and DENIES Defendant's Cross-Motion for Summary Judgment. The judgment of the ALJ is
19 reversed and the action is remanded for further proceedings consistent with this order.

21 IT IS SO ORDERED.

23 Dated: August 4, 2006

_____
EDWARD M. CHEN
United States Magistrate Judge